UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Respondent,<br><br>v.<br><br>KRISTER SVEN EVERTSON,<br><br>Defendant-Movant. | Case No.  4:10-cv-00148-BLW<br>4:06-cr-00206-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Krister Sven Evertson's ("Evertson") Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Dkt. 1).  Having reviewed the Motion, the Government's Response (Dkt. 6), Evertson's Reply (Dkt. 9), and the underlying criminal record, the Court enters the following Order dismissing the § 2255 Motion. The Court also denies Evertson's Motion for New Trial filed in the criminal case three months after the filing of the § 2255 Motion.  Dkt. 125 in Case No. 4:06-cr-206-BLW.

## BACKGROUND AND SUMMARY OF ISSUES

### 1.    Factual Background

Evertson, a self-taught chemist, was attempting to develop a less expensive method of manufacturing sodium borohydride.  More specifically, his goal was to

manufacture it using a high-temperature process involving several ingredients – including sodium metal, anhydrous borax, and silicon – for possible use in hydrogen fuel cells. Evertson and his sister and brother-in-law, Diana and Tim Sundles, formed SBH Corporation to facilitate those efforts which were to take place in Salmon, Idaho, where the Sundles resided.

Tim Sundles agreed to finance the endeavor with $100,000 and to subsequently market the product, while Evertson agreed to provide the time and labor to develop the product. Evertson purchased ten metric tons of sodium metal from China as well as several other chemicals and spent approximately a year and a half at the Tanner warehouse in Salmon trying to produce the sodium borohydride using his new method.

At the end of that period of time, Evertson had expended the $100,000 but had not yet successfully produced sodium borohydride. He decided to return to Alaska, where he had previously resided, to accumulate additional funds through his gold mining operation there to complete the manufacturing process. Prior to leaving Idaho, Evertson made arrangements for his materials and equipment to be stored at the yard of the Steel and Ranch Center in Salmon owned by Robert Chaffin.

With the assistance of Chaffin and Chaffin's father, Clyde Chaffin, Evertson transported, or caused to be transported, approximately sixty 55-gallon drums of sodium metal (a hazardous material that reacts violently with water) and several large tanks containing reactive and corrosive process wastes from the Tanner warehouse to the Steel and Ranch Center.

MEMORANDUM DECISION AND ORDER - 2

During the time Evertson was in Alaska, he had very limited contact with the Sundles or Steel and Ranch owner Robert Chaffin.  Evertson did not communicate any specific plans to return, although he had generally indicated before he left that he would return when he had earned enough money to continue with the manufacturing process. Chaffin understood that he would return in approximately one year.

While in Alaska, Evertson was charged with violating the Hazardous Materials Transportation Uniform Safety Act ("HMTUSA") by shipping pieces of sodium metal by air from Alaska that he had sold on eBay.  He was acquitted following a jury trial. During the course of the investigation of that charge, Evertson informed Environmental Protection Agency ("EPA") officials about the sodium and other materials in Salmon.  As a result, EPA officials performed a site inspection of the stored materials, determined that the materials presented an imminent risk of harm to the community, and conducted an emergency removal.

## 2.    Procedural Background

On September 26, 2006, the Government filed a three-count Indictment charging Evertson with (1) transporting on or about August 1, 2002, both sodium metal (a Class 4.3 *Dangerous When Wet* material) and hazardous waste without complying with the United States Secretary of Transportation's regulations in violation of 49 U.S.C. § 5124 (Willful Violation of Laws and Regulations Related to Transportation of Hazardous Materials); (2) on or about August 1, 2002 through May 27, 2004, storing and disposing of hazardous waste in above-ground storage tanks without a permit in violation of 42

U.S.C. § 6928(d)(2)(A) (Knowing Violation of Laws and Regulations Related to Storage and Disposal of Hazardous Waste); and (3) on or about August 1, 2003 (sic) through May 27, 2004, storing and disposing of hazardous waste in 55-gallon drums without a permit also in violation of 42 U.S.C. § 6928(d)(2)(A).

Evertson was convicted of all charges following a six-day jury trial during which he was represented by appointed counsel Steve Richert and Nick Vieth.  The Court imposed a sentence of 21 months on each count to be served concurrently.  *Judgment*, Dkt. 79 in criminal case.  The Court also imposed a special assessment of $100 on each count and restitution of $421,049 for the hazardous waste cleanup.  *Id*.  He thereafter appealed his conviction and sentence challenging certain jury instructions on various grounds, the alleged constructive amendment of the transportation of hazardous materials charge, and the award of restitution.  Evertson was represented on appeal by appointed counsel Greg Silvey.

The Ninth Circuit affirmed Evertson's conviction and his sentence on all but the restitution issue.  *United States v. Evertson*, 320 Fed. Appx. 509 (9th Cir. 2009).  It found that it was plain error to order restitution as part of the sentence and remanded for entry of an amended sentence.  *Id*. at 513.  Following a hearing, the Court entered an Amended Judgment to reflect imposition of restitution as a condition of supervised release.  *Amended Judgment*, Dkt. 121 in criminal case.

Evertson filed a petition for a writ of certiorari represented by the Washington Legal Foundation of Washington, D.C., raising two issues:

1.      Was the United States required to demonstrate to the jury beyond a reasonable doubt that the materials in question were "hazardous waste" because they had been abandoned by Mr. Evertson, or was it sufficient . . . for the United States to demonstrate that the Environmental Protection Agency had determined that the materials were "hazardous waste."

2.      In order to show that the materials in question were "hazardous wastes," was the United States required to demonstrate that Mr. Evertson intended to abandon the materials?

The Supreme Court denied the petition on October 20, 2009.   Evertson thereafter timely filed the pending § 2255 Motion.  At the time of the filing, Evertson had already completed serving his term of incarceration.  However, because he was still serving his term of supervised release, the custody requirement of 28 U.S.C. § 2255 was satisfied. *See Matus-Leva v. United States*, 287 F.3d 758, 761 (9th Cir. 2002) (finding that because the movant was still subject to supervised release, he was in "custody").  Evertson's subsequent early discharge from supervised release did not moot his § 2255 Motion.  *See Chacon v. Wood*, 36 F.3d 1459, 1463 (9th Cir. 1994) (overruled on other grounds) (finding release from custody does not moot a habeas petition because there is an irrebuttable  presumption that "collateral consequences flow from any criminal conviction").

**3.      Issues**

In his § 2255 Motion, Evertson alleges several grounds of ineffective assistance of counsel; misleading jury instructions; prejudicial variance between the Indictment and the jury instructions; vagueness of the Resource Conservation and Recovery Act

("RCRA") exemptions; incorrect legal theory as a basis for conviction under Count Two; Fifth Amendment denial of due process based on cumulative ineffectiveness of counsel; and cumulative trial errors.

Despite the substantial number of issues and the lengthy § 2255 Motion and Reply, the gravamen of Evertson's argument is fairly simple and can be broken down into four claims: (1) that he did not authorize transport of the sodium and other materials; (2) that he did not abandon or intend to abandon the sodium and other materials; (3) that he intended to return to Idaho as soon as he had enough money to complete the manufacturing process; and (4) that he would have been acquitted if his attorneys had been competent, if he had been allowed to testify, or if the jury had been properly instructed.

More specifically, Evertson states that he stored the materials and left Idaho because he could not afford to buy the additional propane needed to heat the sodium mixture to a sufficiently high temperature to make sodium borohydride, that he always intended to return to continue the process, that he paid for two years of storage, that he was prepared for and looking forward to a profitable year of mining in Alaska at the time of his arrest in 2004 that would have allowed him to return, and that he could have sold some of the materials to fund the completion of the project.

## LEGAL STANDARDS

### 1.    28 U.S.C.  § 2255

Title 28 U.S.C. § 2255 provides four grounds under which a federal court may

grant relief to a federal prisoner who challenges the imposition or length of his or her incarceration: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" and (4) that the sentence is otherwise "subject to collateral attack."  28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that a federal district court judge must dismiss a § 2255 motion "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief."

If the Court does not dismiss pursuant to Rule 4(b), the Court shall order the Government "to file an answer, motion, or other response within a fixed time, or to take other action the judge may order."

The Court may dismiss a § 2255 motion at other stages of the proceeding such as pursuant to a motion by respondent, after consideration of the answer and motion, or after consideration of the pleadings and an expanded record.  *See* Advisory Committee Notes following Rule 8 of the Rules Governing Section 2254 Proceedings incorporated by reference into the Advisory Committee Notes following Rule 8 of the Rules Governing Section 2255 Proceedings.

If the Court does not dismiss the proceeding, the Court then determines under Rule 8 whether an evidentiary hearing is required. The Court need not hold an evidentiary hearing if the issues can be conclusively decided on the basis of the evidence in the

MEMORANDUM DECISION AND ORDER - 7

record.  *See Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994).

**2.      Ineffective Assistance of Counsel**

The well-established two-prong test for evaluating ineffective assistance of counsel claims is deficient performance and resulting prejudice.  *See Strickland v. Washington*, 466 U. S. 668 (1984).  Mere conclusory allegations are insufficient to state a claim of ineffective assistance of counsel.  *See Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989).

In order to establish deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  Under the performance prong, there is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance."  *Id*. at 689.  This is so because for the defendant, "[i]t is all too tempting . . . to second-guess counsel's assistance after conviction or adverse sentence. . . ."  *Id.*  For the court, "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell v. Cone*, 535 U.S. 685, 702 (2002) (discussing *Strickland*).

In order to establish prejudice, a defendant must affirmatively prove by a reasonable degree of probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.  The *Strickland* standard is "highly demanding."  *Kimmelman v. Morrison,* 477 U.S. 365, 381-82; 386 (noting that the court should "assess counsel's overall performance throughout the case" when evaluating whether his assistance was reasonable).

MEMORANDUM DECISION AND ORDER - 8

Both prongs of the *Strickland* test must be met "before it can be said that a conviction (or sentence) 'resulted from a breakdown in the adversary process that render[ed] the result [of the proceeding] unreliable' and thus in violation of the Sixth Amendment." *United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687).

## ANALYSIS

The Government prepared and submitted a chart with its Response indicating the grounds of relief asserted by Evertson in his § 2255 Motion. *See Response*, Ex. A, Dkt. 6-1. The chart identifies the grounds raised on appeal (Grounds 2 and the variance issue of Ground 3), the grounds of ineffective counsel not raised on appeal (Ground 1, the remainder of Ground 3, Ground 5, and Ground 6), and the grounds neither raised on appeal nor asserted as ineffective assistance of counsel claims (Ground 4 and Ground 7). Evertson's grounds listed in the § 2255 Motion itself are numbered differently from the grounds discussed in his supporting memorandum. The chart appears to refer to the numerical designation in the supporting memorandum. The government's suggested organization provides a coherent organizational approach to Evertson's claims – which are intricate and sometimes confusing. Accordingly, the Court will address the claims by category in the manner suggested by the Government.

**1.     Grounds Previously Raised on Appeal**

Evertson reasserts several claims previously decided on appeal. *Issues* decided adversely on appeal cannot be relitigated in a § 2255 motion. *Odom v. United States*, 455

MEMORANDUM DECISION AND ORDER - 9

F.2d 159, 160 (9th Cir. 1972).  Likewise, *arguments* raised on appeal and rejected cannot be relitigated in a § 2255 motion.  *United States v. Currie*, 589 F.2d 993, 995 (9th Cir. 1979).  An exception exists, however, in certain limited circumstances.  *Feldman v. Henman*, 815 F.2d 1318, 1322  (9th Cir. 1987).  Generally, the exception applies where the "ends of justice" require reaching the merits of a previously determined claim. *Molina v. Rison*, 886 F.2d 1124, 1127 (9th Cir. 1989).  To meet the "ends of justice" criteria, a court must find that (1) there has been a change in the law; or (2) "manifest injustice."  *Id*. at 1131.

The Government listed seven issues that were raised and decided adversely to Evertson on appeal: (1) that the jury instructions omitted an element regarding Evertson's knowledge of whether the material abandoned was waste, (2) that the jury instructions omitted an element of the offense regarding harmfulness, (3) that the prosecutor incorrectly argued that Evertson admitted the material was waste, (4) that the jury instructions did not require the jury to find that the materials were waste, (5) that the jury instructions did not require the jury to find that Evertson knowingly abandoned the materials, (6) that the jury instructions erroneously directed that the EPA determines what waste is hazardous, and (7) that the variance between the Indictment and HMTUSA jury instruction was prejudicial.  *Response* at 13-15.

The Court finds that the above-listed issues were raised and decided on appeal, that there has been no change in the law since Evertson's trial, and that there is no manifest injustice that would allow the claims to be relitigated.

MEMORANDUM DECISION AND ORDER - 10

**2.      Ineffective Assistance of Counsel Claims**

Ineffective assistance of counsel claims are generally addressed in the first instance by the district court in a § 2255 proceeding rather than on direct appeal given the fact-intensive nature of the inquiry.  *See Massaro v. United States*, 538 U.S. 500, 504-506 (2003).  Therefore, Evertson is not barred from raising these claims here despite not having raised them on direct appeal.

Evertson's primary claim of ineffective assistance of counsel is Richert's and Vieth's alleged failure or refusal to allow him to testify at trial.  However, he also complains of their failure to investigate, their failure to call his sister, Kristina Daly, as a witness, and several other shortcomings in their performance that will be discussed below.

**A.      Failure to Allow Evertson to Testify**

Evertson claims throughout his § 2255 Motion and his Reply that he desperately wanted to testify but that counsel would not allow him to do so in part because of their alleged 20-year policy of not allowing defendants to testify and in part because they believed that he would be convicted if he testified.

The Government submitted affidavits from Richert and Vieth in support of its Response.  *See Richert Aff.*, Dkt. 6-4; *Vieth Aff.*, Dkt. 6-5.  Richert stated that he has never had a 20-year policy of not allowing defendants to testify but that he generally advises against having a defendant testify at trial because it usually is detrimental to the case. *Richert Aff.* ¶ 5.  Richert and Vieth state that they advised Evertson not to testify after a

break during the trial in which the Government showed them impeaching material that it intended to use if Evertson testified. *Richert Aff.*, ¶ 6, *Vieth Aff.*, ¶ 6. The material was the transcript of Evertson's testimony at the trial in the Alaska case in which he was acquitted. *Id.*

Both Richert and Vieth agreed that the impeaching material seriously undercut their defense theory that Evertson had not abandoned the materials but intended to return to Idaho to work on his invention. *Richert Aff.*, ¶¶ 7-9; *Vieth Aff.*, ¶¶ 7-8. Furthermore, they believed that all of the evidence Evertson wanted to present to the jury through his testimony had already been presented through other witnesses. Vieth did not recall Evertson's ever claiming before trial that the materials had been moved without his knowledge or permission. In Vieth's opinion, this would have been inconsistent with Evertson's persistent claims that he had asked Chaffin to store all of the materials and that he paid for the storage with a sack of borax. After discussing their concerns with him, Evertson agreed not to testify. *Richert Aff.* ¶ 10; *Vieth Aff.* at ¶ 11.

Vieth advised the Court after the noon break that Evertson would not be called as a witness. *Trial Tr.* at 724. The Court then confirmed with Vieth that he had discussed with Evertson the right to testify and explained his options. *Trial Tr.* at 725. The Court noted that it sometimes questions a defendant when "through body language or otherwise" it thinks a defendant may want to testify. *Id.* However, the Court did not observe any indications at the time that Evertson wanted testify, and it was satisfied with Vieth's representation that Evertson concurred with the decision. *Id.*

A defendant's constitutional right to testify in his own behalf is implicit in the Fifth, Sixth, and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). However, "[w]hether the defendant is to testify is an important tactical decision as well as a matter of constitutional right." *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972).

### *(1)     Constitutional Claim*

"Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). A defendant's "silence" after his attorney decides not to call him as a witness implies that he has waived the right to testify on his own behalf. *See United States v. Pino-Noriega*, 189 F.3d 1089, 1095 (9th Cir.) *cert. denied*, 528 U.S. 989 (1999). Rather, "[a] defendant who wants to reject his attorney's advice and take the stand may do so 'by insisting on testifying, speaking to the court, or discharging his lawyer.'" *Id*. at 1094-95 (citations omitted). The failure to testify should "not be raised as an afterthought after conviction." *Id*. at 1096.

Courts "have repeatedly held that the Constitution does not require a trial court to question a defendant *sua sponte* in order to assure that his decision not to testify was undertaken knowingly and intelligently unless there is some indication that the defendant has been prevented from exercising that right." *United States v. Stark*, 507 F.3d 512, 516 (7th Cir. 2007) (quoting *United States v. Manjarrez*, 258 F.3d 618, 623 (7th Cir. 2001)). More specifically to Evertson's case, a court is not required to inquire where there is no evidence of conflict between the defendant and counsel. *Stark*, 507 F.3d at 516-17 (citing

cases from several circuits including the Ninth Circuit).  *See also United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989) (listing seven reasons for not requiring a judge to inquire including that a judge should not interfere with defense strategy), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991).

In his § 2255 Motion and Reply, Evertson emphasizes repeatedly that he wanted to testify, that he was waiting for the Court to ask him directly, that he became emotionally upset when told he would be convicted if he testified, and that he felt conflicted because "his [Evertson's] Lord wanted me to testify" but Vieth's "God [said] he should not testify" – a statement Vieth denies making.  *§ 2255 Mem.* at 21-22; *Reply* at 22-30; *Vieth Aff.* ¶ 5.  However, the bottom line is that whether or not Vieth made the statement, there was no apparent conflict between Evertson and counsel in the courtroom, and Evertson waived his right to testify by remaining silent following Vieth's colloquy with the Court.

### (2)    *Strategic Decision*

Evertson believes he *may* have been acquitted if he had testified because he had been acquitted in his Alaska trial after testifying.  He also believes that his Alaska testimony "did not contain any damning or impeaching evidence that the prosecutor could have used against me." *Reply* at 28-29.  The transcript reflects otherwise.

The Government submitted the transcript of Evertson's testimony at the Alaska trial. *Response*, Ex. F, Dkt. 6-6.  Rebutting Evertson's claims that the testimony was not impeaching, the Government summarized numerous portions of the testimony from which the jury could have concluded that Evertson had no money, had no intention of returning

to Idaho, was familiar with DOT regulations, and had seen warning labels on the drums of sodium when they were delivered to Salmon indicating the sodium was "dangerous when wet." *Response* at 8 -10.  The Court will not repeat them here.

The Court has reviewed the complete transcript of Evertson's Alaska testimony and finds other portions that would have been detrimental to his defense as well.  For example, when describing the manufacturing process on cross examination, he concluded, "Then we ran out of propane, so I – the company didn't have enough money to refill the tank, so I just let it cool off and that was the end of the business." *Alaska Tr.* 2-76, Dkt. 6-6.  When asked how close he had gotten to his goal, he said, "Pretty close.  Pretty doggone close, yes.  But I had no money." *Id.*  During voir dire in aid of an objection to questioning Evertson about how he got the sodium from Idaho to Alaska that he shipped on eBay, Evertson said he left six packages of it at his sister's home in Oregon for her to ship if he needed money. *Alaska Tr.* 2-102-03.  When asked why he didn't have his sister ship it all at once, he said that, "I didn't have an address up here then, that's right," which could have supported the Government's claim that he was unreachable. *Alaska Tr.* at 2-104-05.

On a number of occasions, the Ninth Circuit has rejected similar claims of ineffective assistance of counsel.  For example, in *Matylinsky v. Budge*, 577 F.3d 1083 (9th Cir. 2009), the defendant, on trial for killing his wife, had argued that counsel prevented him from testifying to demonstrate to the jury that his actions were neither premeditated nor deliberate.  The court upheld the district court's ruling that counsel's

decision to not put the defendant on the stand was reasonable because he would have been subjected to "damning cross-examination on his prior convictions," the jury "would have witnessed his matter-of-fact delivery regarding his wife's death and general disinterested nature," and his testimony was inconsistent with the theory of the case. *Id*. at 1097-98. Of note, the court also stated that to the extent counsel may have infringed on the defendant's right to testify, there was no indication of prejudice. *Id*. at 1098.

Similarly, in *Medley v. Runnels*, 506 F.3d 857 (9th Cir. 2007), the defendant had wanted to testify that he killed the victim in self-defense. Counsel recommended against testifying because of the defendant's prior convictions, his inconsistent statements during a lengthy interview with police, and the inconsistency with the defense theory that someone else killed the victim. Noting those factors plus the "more than sufficient" other evidence to convict the defendant, the Ninth Circuit found that the inability to testify was not prejudicial.

Finally, in *Dows v. Wood*, 211 F.3d 480 (9th Cir. 2000), the defendant claimed ineffective assistance of counsel where the defendant alleged that counsel threatened to walk out on him if he testified. The district court had noted that the defendant – like Evertson here – had never indicated during the trial that he wanted to testify or that counsel prevented him for doing so. The Ninth Circuit found that counsel had very good reason for suggesting that the defendant not testify because of the risk of impeachment based on three prior convictions. *Id*. at 487.

Just as there were valid reasons in *Matylinski*, *Medley*, and *Dows*, to advise against

testifying based on the circumstances of the respective cases, there were valid reasons here based on the impeachment testimony and the speculative nature of his claims.

A recurring theme of Evertson's § 2255 Motion and Reply regarding the right to testify is that he would have been acquitted had he testified.  In his Reply, Evertson lists twenty-one  "disputed facts" that his testimony could have addressed to rebut the Government's position that he abandoned the materials.  *Reply* at 10-19.  However, that conclusion is entirely speculative, especially given the impeachment potential of the Alaska testimony.  Evertson presumes that the jury would have believed his testimony over that of several other witnesses.  Those twenty-one "disputed facts" appear below with the Court's comments on each in italics indicating either contradiction in the record or illustrating the unreasonableness of his belief that his testimony would have made a difference:

1.  Evertson knew he had prepaid rent for two years and not one year because he gave Chaffin a 2,000-pound sack of borax and their arrangement was 1,000 pounds a year.

    *Robert Chaffin testified that he understood the rental was one sack for one year – not 1,000 pounds a year.  He thought the sack was 1,000 pounds rather than 2,000 pounds.  Defense counsel raised the issue on cross examination that a sack was 2,000 pounds and the agreement was was 1,000 pounds a year.  Chaffin agreed that although he thought it was clear that the agreement was for a year, there could have been a misunderstanding because the agreement was not in writing. If Evertson had testified, the jury would have had to weigh Chaffin's unimpeached testimony with Evertson's testimony. Assuming Evertson had been impeached with the Alaska testimony, it is not likely that the jury would have credited Evertson's testimony that the agreement was for two years.*

2.     Evertson did not request or authorize the Chaffins to move the sodium or
the borax supersacks.  They were moved when he was running an errand.
He has email evidence that Vieth knew about this even though Vieth states
he did not recall that Evertson had ever told him.  The storage agreement
was reached after the materials were already in place.

*Chaffin testified that they moved the sodium and borax first
and then the trailers. This would have conflicted with
Everson's testimony, again leaving the jury to decide whether
to believe Evertson, whose testimony would have been
impeached, or Chaffin's unimpeached testimony.  In response
to Vieth's questioning on cross examination, Chaffin stated
that he did not recall whether Evertson left or not during the
move.*

3.     Evertson did not tell his sister that the process did not work.  He told her
that the process did work but that he needed to return to Alaska to earn
funds.

*His sister, Diana Sundlestestified that there are certain things
that she could not remember because she was so sick and on a
lot of medication at the time.  It is unlikely that the jury put
much weight on any of her testimony.  Defense counsel
established that her illness was part of the reason she did not
communicate very much with her brother while he was in
Idaho.*

4.     Evertson was ready, willing, and able to mine in the summer of 2004 and
could have generated a "solid revenue stream" within about a week.

*His Alaska testimony that he barely eked out a living mining
would have cast considerable doubt on this statement.*

5.     Evertson had sufficient assets stored at Steel and Ranch to restart his
invention if the Alaska mining operations "hit a snag."  He could have sold
the three trailers, and/or the new borax supersacks, and/or some of the
sodium and still had enough to continue his process.  He would have just
needed $5,000 to restart the process.

*If he only needed $5,000 to restart the process and could have
sold some of the borax or sodium to generate that amount,*

> *why did he go to Alaska for two years to make the money he*
> *needed rather than selling some of his materials?  This*
> *statement is simply not credible.*

6.    Evertson was always reachable by his business partners, the Sundles, and
      Diana did contact him at his mother's house in Alaska.

> *While the Sundles probably knew (at least after his sister*
> *called on Thanksgiving in 2003) that he was living at his*
> *mother's, Chaffin did not and would not have known unless*
> *told by the Sundles.  In any event, it was Evertson's lack of*
> *contacting them that led to the inference that he was not*
> *returning.  It is difficult to believe that one who had tens of*
> *thousands of dollars worth of materials supposedly worth up*
> *to $3,000,000 if sold over time would not have maintained*
> *periodic contact if he planned to return.*

7.    He did not consider any of the materials as being waste, and personal
      knowledge of waste is a requirement under *United States v. Heuer* for a
      RCRA conviction.

> *Evertson's testimony, impeached by the Alaska testimony,*
> *would have lacked credibility.*

8.    He intended to return to Idaho after the summer of 2004 mining season.

> *See No. 4.*

9.    He did not lock his partners out of the Tanner building although he did lock
      his sleeping room within that building.  The Sundles used the building as a
      UPS pickup location.

> *This appears to be a rather minor point in the context of the*
> *entire case.*

10.   The Sundles knew Evertson was leaving for Alaska to live with his mother
      and Evertson told them he was leaving many months in advance.  He gave
      Tim Sundles his forwarding address when he left.

> *Tim Sundles testified that Evertson told him that he was going*
> *to have to leave and make more money and then come back*

*and resume the process, but Evertson did not give him a forwarding address.  He reiterated on cross examination that Evertson told him that he was going to Alaska to mine and make money to come back.  Sundles testified there was "no question" that Evertson told him that he was coming back down.  He also testified that his wife had telephone contact with him in Alaska.  This testimony was actually generally favorable to Evertson.*

*Evertson says that he told the Sundles he was leaving and would be living with his mother.  However, in his testimony during voir dire in Alaska regarding having another sister ship him some sodium to Alaska, he said that he did not have a forwarding address at that time.  In any event, it was <u>Evertson's</u> failure to contact <u>them</u> that was relevant on the intent issue.*

11.   Evertson did not give Robert Chaffin any email addresses.  He only helped him install pop-up blockers on his computer.

> *Whether or not he gave Chaffin unworkable email addresses, it was <u>his</u> duty to contact <u>Chaffin</u>, not vice versa.*

12.   Evertson never knowingly walked away from his sister in a grocery store.  He may not have seen her because he is blind in one eye.

> *This is speculative and a minor point.*

13.   Evertson had contact with Diana Sundles when she called on Thanksgiving in 2003 and stated that it was a "business call."  She said she had spoken with Chaffin, Tim Sundles had given her the responsibility to sell all or part of the stored material, and she was asking for help.  He feels this rebuts the statement that he never contacted Tim or Diana about SBH business after leaving Idaho.

> *This does not rebut the statement that he never contacted the Sundles.  <u>Diana</u> contacted <u>him</u>.  Furthermore, he did not appear to be objecting to the sale of all or part of the material which would counter his argument that he intended to return to complete the process.*

14.   EPA agent Marc Callaghan did not call him until June 17, 2004 "long after the stored materials had been removed as garbage (waste)."

*As shown below, counsel was constrained from eliciting this fact on cross examination due to Fifth Amendment concerns and the directive of the Court not to discuss the Alaska case.*

15.   Diana Sundles was SBH Secretary and handled all of SBH's receipts and paperwork and accounting contrary to her testimony that she did not.

*It is apparent from her testimony that she did not remember much at all from that time period given her illness.  Tim Sundles testified that she was the secretary.*

16.   Evertson called Chaffin in September of 2003 and asked him if the borax supersacks were covered.  Chaffin did not mention rent.  He said everything was fine.

*Although it could be inferred from Chaffin's failure to raise an issue regarding rent at this time, it is not necessarily indicative that the rental period had not expired.*

17.   Before Evertson left Salmon in August of 2002, he had carefully covered all of the sodium drums and borax supersacks and other equipment and it was not the "junk" the government stated it was.

*He had not seen the materials for almost two years, so he would not have known its condition.*

18.   Evertson's lab heating notebook would have shown that the only reason the heating process was stopped was that the 500-gallon propane tank ran out which the Alaska testimony would have also shown.  If he had more propane, the process would have worked.

*He testified in Alaska that he had run out of money for propane, but he did not testify that the process would have worked.*

19.   Evertson did not see placards on the sodium delivery truck.  Clyde Chaffin (Robert Chaffin's father) told the EPA he did not see any placards.

*Whether or not the driver who delivered the sodium to the
Tanner warehouse had placards on his truck is irrelevant.*

20. Evertson met a former employee of Robert Chaffin's in Alaska in January-February of 2003-2004 and asked him to say hello to Robert for him. When he saw the former employee again, he said Robert had said hello. This would rebut the Government's argument that he never had contact with Chaffin again except for a short personal call in the fall of 2002.

   *This hardly qualifies as having contact with Chaffin.  It is not
   even known if the former employee actually had that
   exchange with Chaffin or merely said that he had.
   Furthermore, testimony about what Chaffin said would have
   been inadmissible hearsay.*

21. The notation in one of his notebooks of "waste" in a reactor was hypothetical and that the notation of "bailey" had nothing to do with storage but rather was a note on how to contact the U.S. Customs auction in 1998.

   *Any attempts to explain the meanings of the notations would
   have been subject to the same credibility issues as his other
   testimony.*

Additionally, although not mentioned in counsels' affidavits, it is conceivable that Evertson's stuttering impediment factored into the decision that Evertson not testify just as the defendant's "flat affect" or "disinterested" demeanor influenced counsel's decision in *Matylinski*.  Vieth referred to Evertson's speech impediment or reluctance to speak in public in both his opening and in his closing arguments.  *Trial Tr.* at 19 (Opening); 51 (Closing), Dkt. 106.

In his Reply, Evertson raises the issue of his stuttering and thoroughly discusses his resulting communication problems and coping mechanisms.  *Reply*, Ex. A, *Evertson Aff.* ¶ 29 at 12-14 (in expandable folder in Clerk's Office).  Although he states that he

would have been willing "to swim upriver against this tide of fear" of testifying or speaking in public, the very problems he describes illustrate the wisdom of recommending against testifying, particularly given the impeachment evidence. Indeed, he describes the tendency of using a "substituted word" for an "intended word" that may not be "just right in the legal sense" that "could land him/her person in prison." *Id*. at 13. He concludes that "I have stuttered all my life. So I know exactly what can happen with words. I am better in the written word. I can communicate more clearly." *Id*. In any event, Evertson's description of the potential issues caused by his stuttering further illustrates the totally speculative nature of the claim that he would not have been convicted if he had testified.

Finally, as noted in the disputed facts and the Court's comments thereon, other witnesses testified to matters about which Evertson wanted to testify. For instance, both Tim Sundles and Robert Chaffin testified that Evertson had told them that he was going to Alaska to make more money so he could return to continue his process. Sundles testified that Diana had phone contact with Evertson. Chaffin testified that he spoke with Evertson once. His expert witness testified that the materials were not waste and were, in fact, ready to be used essentially as soon as Evertson had the capability of raising the temperature sufficiently high. With regard to wanting to testify about not authorizing the Chaffins to move the sodium and borax, Vieth told him that if he did testify on that issue, the jury would have a hard choice deciding whether to believe him or Chaffin. *Reply*, Ex. A., *Evertson Aff.*, ¶ 30. Indeed, the risk of having Evertson impeached with the

Alaska testimony pervaded each of the issues Evertson raises.

Evertson's claim of ineffective assistance of counsel based on failure to testify fails both because he remained silent when Vieth advised the Court that Evertson did not want to testify and because Vieth's and Richert's strategic decision against his testifying was well-grounded.  Here, the strategy, though unsuccessful in securing an acquittal, was the result of "reasonable professional judgment" in light of counsels' well-founded concerns about opening the door to impeaching testimony that would undermine their defense.  *Strickland*, 466 U.S. at 699.

### B.   Failure to Call Sister as a Witness

As stated above, Evertson contends that he did not authorize the Chaffins to move the sodium and the borax.  He was upset when he returned from running an errand and found that it had been moved.  He had wanted to first investigate places to store those materials and how to properly transport them.  He believes that counsel were ineffective for not calling his sister, Kristina Daly, as a witness to support his position.  Evertson states that his sister could have supported his testimony (or testified even if he did not testify) that he called her that afternoon and told her how upset he was that the Chaffins had moved the materials while he was running an errand.

Vieth does not recall being made aware that the Chaffins had moved the sodium and borax without his permission.  He stated, "This claim is inconsistent with his persistent claims that he had asked the Chaffins to store all of his materials from the Tanner building and that he paid Robert Chaffin in the form of Borax for the storage of

MEMORANDUM DECISION AND ORDER - 24

the materials." *Vieth Aff.*  ¶ 12.

To rebut Vieth's affidavit, Evertson referred to many emails that he had sent Vieth telling him that he had not authorized moving the sodium and borax.  *Reply, Evertson Aff.*, Ex. B.  He also submitted an affidavit of Kristina Daly stating that Evertson called her the afternoon the materials had been moved and that he was "shocked and completely taken by surprise" that the Chaffins had taken anything other than the three trailers.  *Daly Aff. 6/4/2009*, Dkt. 1-3 at 7.

Evertson also submitted a second affidavit of Kristina Daly in which she stated that Federal Defender investigator Ted Brown told her that he had talked to Vieth about having her come to Idaho to testify, that Vieth knew why she was coming to testify, that she came to testify, and that she was never called.  *Daly Aff. 1-3-2010*, Dkt. 1-3 at 8.  Evertson also supports this claim with a draft "Defendant's Brief from the Perspective of the Expert Witness" which refers to the fact that Evertson did not authorize the move.  *Evertson Aff*, Ex. B.  Finally, he attached a copy of "Draft Interview Notes" from "Mark" with a copy to Ted Brown, which also refers to the unauthorized move.  *Id*.  The Court assumes that "Mark" is Evertson's expert witness, Mark Malachowski.

The Court can infer from the cross-examination of Robert Chaffin that Vieth was aware that Evertson had advised him that he had left the Tanner warehouse for a while during the loading.  Vieth asked Chaffin if "Kris" left at anytime to get a jack or any other items that he needed.  *Trial Tr.* at 199.  Chaffin responded that Evertson could have left but he did not recall.  *Id.*  Vieth then asked Chaffin, "You don't remember him

running errands." *Id.*  Chaffin responded that he did not.  *Id.*  Vieth then asked, "Going to Big O Tire or anything – or, I guess, Les Schwab there."  *Id.*  Chaffin again responded that he did not.  *Id.*

While Vieth may not remember three years later what he knew at the time of trial on this issue, it appears that he did know that Evertson was claiming to have left and that Vieth tried to raise an inference on cross examination that Chaffin moved more than Evertson had authorized him to move.  Furthermore, Daly's testimony would have been inadmissible hearsay given that her testimony would have been offered for the truth of the statement that Evertson had not authorized Chaffin to move anything other than the trailers.  *See Fed. R. Evid.* 801.  The only way to get that fact before the jury would have been to have Evertson testify which, as shown above, was not a strategically wise decision.

### C.      Failure to Object to Jury Instruction

Evertson alleges that counsel were ineffective for failing to object to a jury instruction regarding the RCRA counts which resulted in a plain error review rather than a harmless error review.  He claims that the jury was not told that it had to find that he "knew" the materials were waste or that "the required element of personal knowledge of waste" was lacking in the jury instruction. *§ 2255 Mem.* at 25-26.  He claims that counsels' failure to object was due to a misunderstanding of the law rather than a strategic decision.  *Id.*

The Government contends that the Ninth Circuit decided the issue of the jury

instruction on appeal, and the issue cannot be relitigated here. *Response* at 20 (citing *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972)). However, the Court views Evertson's claim not as a challenge to the instruction given but rather a claim that he may have benefitted from the more lenient harmless error standard of review had counsel objected. Therefore, the relevant question is whether the result would have been different under a harmless error analysis. In other words, examined under the harmless error standard, would the court have found that the RCRA instruction was erroneous.

Under the harmless error standard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b).

"Plain error requires (1) an error, (2) that as plain, and (3) that affected the defendant's substantial rights. If these factors are met, relief should be granted only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Lindsey*, 634 F.3d 541, 551 (9th Cir. 2011) (citation omitted). Specifically with regard to jury instructions, "[w]here no objection is made to the omission of an essential element of the charge to the jury, review is for plain error." *Id*. at 554 (citing *United States v. Alghazouli*, 517 F.3d 1179, 1188 (9th Cir. 2008)).

The Ninth Circuit has explained the nuanced differences between the two standards as follows:

When the defendant has made a timely objection to an error

**MEMORANDUM DECISION AND ORDER - 27**

and Rule 52(a) applies, a court of appeals normally engages
in a specific analysis of the district court record – a so-called
"harmless error" inquiry – to determine whether the error was
prejudicial.  Rule 52(b) normally requires the same kind of
inquiry, *with one important difference*:  It is the defendant
rather than the Government who bears the burden of
persuasion with respect to prejudice.  In most cases, a court of
appeals cannot correct the forfeited error unless the defendant
shows that the error was prejudicial. . . .  This burden shifting
is dictated by a subtle but important difference in language
between the two parts of Rule 52: While Rule 52(a) precludes
error correction only if the error "does not affect substantial
rights" (emphasis added), Rule 52(b) authorizes no remedy
unless the error does "affec[t] substantial rights."

*United States v. Olano*, 507 U.S. 725, 735 (1993) (citations omitted) (emphasis added).

Here, the Court's instruction stated that the jury had to determine, among other

things, that "[t]he defendant knowingly *'stored'* or *'disposed of'*, or knowingly caused

others to store or dispose of, *'hazardous waste'* . . . ."  *Jury Instruction 17*, Dkt. 59.  The

Ninth Circuit, citing *United States v. Heuer*, 4 F.3d 723 (9th Cir. 1993), held that "the

term 'knowingly' modifies both words in the unpunctuated phrase 'hazardous waste.'"

*Evertson*, 320 Fed. Appx. at 511 (citing *Heuer*, 4 F.3d at 731 (construing a similarly

worded RCRA statute)). The wording of the decision does not imply a different result

may have been reached under harmless error review.  Rather, it unequivocally found that

the instruction was proper stating that "[t]he jury instructions were consistent with the

elements in 42 U.S.C. § 6928(d)."  *Id.*  Furthermore, the Ninth Circuit also noted that

"neither the prosecution nor the defendant is entitled to any particular language requested

in a proposed jury instruction."  *Id.* (citing *United States v. Perez*, 989 F.2d 1111, 1115

(9th Cir. 1993)).   Accordingly, Evertson cannot demonstrate prejudice because it is highly unlikely that the result would have been different on appeal had counsel objected to the instruction.

### D.   Failure to Raise as Defenses the Exclusions Contained in 40 C.F.R. Part 261[1]

Evertson claims that "[c]ounsel was ineffective because he failed to bring to the Court's attention that there are numerous exemptions to what is a 'solid waste' and what is a 'hazardous waste' under RCRA regulations."  Dkt. 1-5 at 7.  He contends "RCRA has exemptions from a 'solid waste' being a 'solid waste.' And exemptions from a (sic) 'hazardous waste' requiring RCRA permits."  *Id*.  He further contends that counsel "refused to use them" saying that "What Federal Judge would rule that sodium is not a hazardous waste?"  *Id*.  Evertson believes counsel's lack of understanding of RCRA was the basis for his refusal to acknowledge the applicability of the exemptions and assert them as a defense.  *Id*.  The Court notes that the cited provisions in 40 C.F.R. Part 261 primarily refer to "exclusions" and not "exemptions."

The Government contends that none of the exclusions applies to the facts of this case and are all inconsistent with Evertson's defense theories that he had not abandoned the materials and that the material in the tank was an intermediate process stream. *Response* at 21.  The Government also notes that once the materials are abandoned, none

---

[1]  Everston's argument with respect to the exclusions is contained in Exhibit F to his § 2255 Motion which appears at Dkt. 1-5 at 7-15.

of the cited exclusions "means anything." *Response* at 21.  Specifically with respect to

each claimed exclusion, the Government contends as follows:

> 40 C.F.R.§ 261.2(e) – excludes materials that are being recycled if the material is being used as an ingredient in an industrial process to make a product and not being reclaimed. There was no evidence of a recycling process being conducted and to argue that they would have been recycled would have contradicted the defense that the materials were product. *Response* at 21

> 40 C.F.R. § 261.4(c) – excludes wastes in manufacturing process units.  The exclusion does not apply to any waste left in a tank after 90 days, even if the shut-down was temporary.  *See* 45 Fed. Reg. 72025.  Evertson left the waste in the tanks for two years.  *Response* at 23.

> 40 C.F.R. § 261.2(b) – excludes wastes that are intended to be recycled.  There was no indication that Evertson intended to recycle the sodium in the drums or the tank contents.  The Ninth Circuit rejected his claim that the material in one of the tanks was an intermediate process stream.  The materials do not meet the definition of hazardous secondary materials in 40 C.F.R. § 260.10 and were not destined for reclamation.  *Response* at 23.

> 40 C.F.R. § 261.(1)(c)(6) – exempts scrap metal from hazardous waste rules.  Sodium bars are not included in this definition.  The material was not "scrap."  The materials were not "worn or superfluous" and there was no evidence of recycling.  If he intended to recycle the sodium, Evertson would be required to produce documentation showing that there is a market for recycled sodium as opposed to pure sodium and that he possessed equipment capable of recycling. *See* 40 C.F.R. § 261.2(f).  Again, this defense would have been incompatible with his defense that the materials were valuable and he intended to use them to produce sodium borohydride.  *Response* at 23-24.

In his Reply, with respect to the Government's statement that once the materials

are abandoned none of the exclusions are relevant, Evertson states that "[t]he government is partly right, and partly wrong.  They are right in that once the jury has decided, as the fact finders, that there was *intent to discard* the materials, the materials would be waste" even if there is a lawful exclusion.  *Reply* at 52 (emphasis in original).  He believes the Government is wrong here "because *the jury was never charged with the duty to determine if there was an intent to discard*.  Therefore, they could not make this critical determination, as required under the RCRA exclusion regulations, beyond a reasonable doubt."  *Id.* at 52-53.  He believes that the Government is using the term "recycling" "in its common, 'bring it down to the local store as waste to be recycled' definition" rather than the defined meaning in RCRA.  *Id*. at 54

Two of the claimed exclusions are clearly irrelevant.  First, the exemption under 40 C.F.R. § 261.4(c) for hazardous waste in a manufacturing process by its terms is inapplicable where "the hazardous waste remains in the unit more than 90 days after the unit ceases to be operated for manufacturing, or for storage or transportation of raw materials."  Evertson's materials were left in the tanks for two years.  Second, the exclusion set forth at 40 C.F.R. § 261.6(a)(3)(iii) does not apply because the sodium bars do not fall under the definition of scrap metal at 40 C.F.R. § 261.1(c)(6).

Evertson assumes because pure sodium is a metal,  and it was in the form of bars, that it meets the definition of scrap metal because the definition includes "metal bars." However, Evertson focuses on the terms "metal" and "bars" and ignores the complete definition:

> "Scrap metal" is bits and pieces of metal parts (e.g., bars, turnings, rods, sheets, wire) or metal pieces that may be combined together with bolts or soldering (e.g., radiators, scrap automobiles, railroad box cars), *which when worn or superfluous can be recycled.*

40 C.F.R. § 261.1(c)(6) (emphasis added).

In adopting a final rule regarding the definition of solid waste on January 4, 1985, the Environmental Protection Agency cited the definition of "scrap metal" and illustrated the definition in a number of ways:

> "Scrap metal" is defined as bits or pieces of metal that are discarded *after consumer use or that result from metal processing operations.*

50 Fed. Reg. 614 at 619 (Jan. 4, 1985) (emphasis added).

> Scrap metal is waste-like in that it is a *used material that is no longer fit for use* and must be reclaimed before it can be used again, or is a process residue that must be recovered in a different operation from the one in which it was generated.

*Id*. at 624 (emphasis added).

> Put another way, scrap metal is defined as *products made of metal that become worn out* (or are off-specification) and are recycled to recover their metal content, *or metal pieces that are generated from machining operations* (i.e., turnings, stampings, etc.) which are recycled to recover metal.

*Id*. (emphasis added).

Clearly, Evertson's pure sodium bars were not bits and pieces of metal discarded after consumer use, were not "waste-like," were not used materials, did not need to be reclaimed before they could be used again, had not become worn out, and did not need to

be recycled to recover the metal.  Evertson's argument in his Reply that the sodium bars were "superfluous" (a term used in the definition) because he was convicted of storing "waste" is disingenuous.  *Reply* at 55, Dkt. 9-1 at 25.

The remaining exclusions claimed under § 261.2 both pertain to recycling. Definitions for terms in § 261.2 are set forth in § 261.1(c).  "A material is 'recycled' if it is used, reused, or reclaimed."  40 C.F.R. § 261.1(c)(7).  "A material is 'used or reused' if it is either: (i) Employed as an ingredient (including use as an intermediate) in an industrial process to make a product . . . ; or (ii) Employed in a particular function or application as an effective substitute for a commercial product . . . ."  40 C.F.R. § 261.1(c)(5).  Relying on these definitions, Evertson claims that if had been allowed to testify, he would have testified that "brand new industrial sodium is used as an ingredient to make a product in an industrial process."  *§ 2255 Mem.* at 6, Dkt. 1-5 at 12.

Citing § 261.2(e), Evertson states, "Materials are 'not a solid waste if used . . . as an ingredient in an industrial process to make a product.'" *Ex. F* at 1-2, Dkt. 1-5 at 7-8. The quotation, however, is not fully accurate.  The heading under subparagraph (e) is "Materials that are not solid waste *when recycled*."  40 C.F.R. § 261.2(e) (emphasis added). The specific exclusion is then further identified: "Materials are not solid wastes when they can be *shown to be recycled* by being : (i) used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed; . . . . 40 C.F.R. § 261.2(e)(1)(i) (emphasis added).

Evertson appears to be essentially stating that by using the pure sodium bars for

the same purpose for which he originally intended, *i.e.*, making sodium borohydride, he would have been recycling.  The Court fails to see how using the pure sodium metal in making a product can be considered recycling given that it has never been used.  Rather, it would appear to be virgin material.  "[T]he initial use of a virgin material as opposed to secondary material would not constitute recycling."  Susan M. Cooke, *The Law of Hazardous Waste*, Vol. 1 at 2-26 n. 98.   Virgin material is defined as a raw material, including *previously unused* copper, aluminum, lead, zinc, iron, or *other metal* or metal ore, any undeveloped resource that is, or with new technology will become, a source of raw materials.").  *See* 42 U.S.C. § 6903(35) (emphasis added).  Whether the material in the process tank could be considered to be recyclable material, the fact that Evertson left it in the tank for two years would likely preclude the availability of the exclusion regardless of his claimed  intent.  *See Owen v. Browner*, 37 F.3d 146, 149 (4th Cir. 1994) (finding that exclusion did not apply when material had sat for six months before being sent to a recycler).

Finally, citing § 261.2(b), Evertson states, "This exemption exempts materials from being a 'solid waste' and therefore from ever being a 'hazardous' waste if the materials are recycled or *intended to be recycled*."  *§ 2255 Mem.*, Ex. F at 5, Dkt. 1-5 at 11 (emphasis in original).  The full relevant portion of the provision states: "Materials are solid waste if they are abandoned by being: . . . Accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated."  40 C.F.R. § 261.2(b)(3).  The Government agrees that this provision

excludes from regulation materials that are intended to be recycled but notes that there was no evidence that Evertson intended to recycle the materials. *Response* at 23.

Evertson states he would have testified that "the stainless steel reactor contents, and the sodium hydroxide material was *also an intermediate* in an industrial process to make a product." *Id*. (emphasis in original). However, the Ninth Circuit has already rejected his claim that the material in one of the tanks was an intermediate process stream.

Evertson next continues that ". . . as long as the generator "*intends*"  to recycle the scrap metal at some point in the future, the scrap metal is *exempt* from the hazardous waste regulations starting at the point of generation." *§ 2255 Mem.* at 6, Dkt. 1-5 at 12 (emphases in original). However, as shown above, the sodium bars do not meet the definition of scrap metal.

Finally, Evertson argues that the contents of the process tank were co-product in that they were produced for use in making the general product of sodium borohydride and exempt from regulation. *§ 2255 Mem*. at 7, Dkt. 1-5 at 13 (emphasis in original). However, even if that were true, the fact remains that Evertson left the materials in Salmon for two years with minimal contact with Chaffin or the Sundles. His Alaska testimony gave no indication of any intent to return to do anything at all with the materials much less to recycle the contents of the process tank. His testimony regarding the applicability of any of the exclusions would have suffered from the same credibility issues as his testimony that he intended to return to continue his manufacturing process.

The complexity of the exclusions, and the uncertainty of whether they would apply to both of the RCRA counts, underscores the reasonableness of focusing on the theory that Evertson intended to return to Salmon to continue his attempts to manufacture sodium borohydride.  To have done otherwise would have unduly complicated the proceedings. Therefore, Evertson has not demonstrated deficient performance.  Nor has he demonstrated prejudice.  The evidence strongly supports the conclusion that he had abandoned the materials.  Any additional evidence offered in support of the applicability of any exclusions, two of which are clearly inapplicable, would not have likely changed the result.

E.     **Failure to Object to a Variance Between the Indictment and the Instruction for the HMTUSA Count.**

On appeal, Evertson argued that the Indictment was constructively amended by the jury instructions because the Indictment alleged that Evertson willfully violated specific shipping regulations despite knowledge of them whereas the jury instructions did not require that he have specific knowledge of the regulations he violated.  *Reply, Ex. E, Appellant's Brief* at 46-48.

The Ninth Circuit determined that the variance did not materially alter the Indictment or the facts that had to be proven at trial.  *Evertson*, 320 Fed. Appx. at 511.  It explained that because willfulness in an HMTUSA offense requires only knowledge that the conduct is unlawful rather than actual knowledge of the specific regulations violated, the Indictment contained a "surplus *mens rea* allegation that is not an element of the

charged offense," that the failure to include the surplusage in the instruction was therefore not error, and that Evertson had not shown any resulting prejudice from the variance. *Id.* Counsel cannot be deemed ineffective for not raising an issue that Ninth Circuit deemed immaterial and non-prejudicial. Therefore, any prejudice claimed by Evertson in his § 2255 Motion is irrelevant since *Strickland* requires both deficient performance *and* prejudice.

### F. Failure to Spend Time With Evertson

The Court notes that the affidavits of defense counsel filed with the Government's Response state that they, along with support staff and the defense expert witness, spent a significant amount of time communicating with Evertson; that they received hundreds of emails, phone calls, and letters from him; and that he had unlimited access to them during working hours. *Richert Aff.* § 2; *Vieth Aff.* § 2. Evertson's claim is apparently based on the fact that counsel allegedly responded to only a few of his 100 or so emails and that because he was in Alaska and they were in Idaho, he had little opportunity to meet personally with counsel.

Whether counsel responded or not and whether he had what he considered adequate personal contact with counsel is not determinative of the nature of counsel's performance. Just as important as client contact, if not more so, is the time spent reviewing discovery, filing and responding to pre-trial motions, and preparing for trial. The Court assumes it was Evertson's choice to remain in Alaska pending trial. Furthermore, the Court also notes that Evertson had not one, but two experienced

criminal defense attorneys and had indirect access to counsel through his expert witness. The time required to respond to the voluminous emails and numerous phone calls would have been an undue burden on counsel.  An indigent defendant is entitled to appointed counsel but not to unlimited access to that counsel at government expense.

### G.      Failure to Challenge the Indictment

In response to Evertson's argument the his attorney did not challenge the Indictment, the Government points out that Evertson's counsel did move to dismiss the Indictment on jurisdictional grounds.  *See Motion to Dismiss*, Dkt. 15.  The Court denied the Motion from the bench following oral argument.  *Minute Entry*, Dkt. 28.  However, Evertson's § 2255 claim has nothing to do with jurisdiction.

Evertson believes counsel should have challenged the Indictment on the grounds that Mr. Oesterle from the EPA responded to a grand juror's question regarding the safety of sodium metal in the drums stating that two of the drums were compromised, one of which lacked a lid which could have resulted in a "problem" if the contents had come in contact with rain and the other of which had evidence of deterioration which could have been caused by contact of the sodium with the drum. *§ 2255 Mem*. at 68-69.  Evertson states that it was eventually determined during trial preparation that the information was incorrect and the testimony not presented at trial.  *Id*. at 69.

Evertson cites various reasons why the EPA should have known through its investigation that the two drums did not contain sodium metal – including his letters of explanation to the Idaho Bureau of Homeland Security, the Attorney General, and the

prosecutor.  He concludes that the grand jury "*may* have been influenced by these false facts" and if they had known that "there was no impending danger from 'rain influence,' they *may not* have returned a true indictment." *§ 2255 Mem.* at 69 (emphasis added).

The Court can find neither deficient performance nor prejudice based on this allegation.  The very language of this claim is indicative of its speculative nature.  Whether those two compromised drums contained sodium metal or not would have no bearing on whether the 55 drums of sodium metal and other chemicals were left at the site or whether sodium metal is reactive with water.

### H.    Failure to Object to Prosecutor's Statement During Closing Argument

Evertson objects to the failure of counsel to object to the prosecutor's comments that Evertson told an FBI agent that he was familiar with DOT regulations.  *§ 2255 Mem.* at 68.  The full passage in the closing read as follows:

> He told Agent Espland in Alaska, Agent Espland from the
> FBI, that he was familiar with DOT regulations.  He maybe
> minimized his knowledge to Agent Espland, but he said,
> "Yes, I am familiar with them."  That's undisputed.

*Reporter's Tr. Excerpts of Proceedings* at 40, Dkt. 106 at 10.

A review of Agent Espland's testimony on this subject reveals that Agent Espland testified the Evertson denied knowing the rules but copied DOT regulations from eBay accounts, looked up regulations, and copied them from other shippers.  *Trial Tr.* at 269.  He further testified that Evertson said that he was not familiar with shipping names, UN numbers, labeling, placarding, or hazardous materials shipping documents.  *Trial Tr.* at

270.

The Court finds that Agent Espland's testimony indicates that Evertson was generally familiar with at least the existence of DOT regulations and, therefore, the prosecutor's statement did not so mischaracterize his testimony as to cause concern. "Because many lawyers refrain from objecting during opening statement and closing argument, *absent egregious misstatements*, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (emphasis added). *See also United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) ("From a strategic perspective . . . many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel . . . .").

The alleged misstatement here, if indeed it was a misstatement, was certainly not egregious. Therefore, counsel's failure to object was not indicative of deficient performance.

## I.      Failure to Object to Response Team Video

Evertson objects to counsel's failure to object "to the introduction of highly inflammatory and prejudicial videos of sodium reactivity and pictures of response teams in Level A Haz-Mat Suits" as being prejudicial under Federal Rule of Evidence 403. He contends that he told counsel that they should stipulate that "the pure sodium and the sludge possessed reactivity 'hazardous characteristics' applicable under RCRA." *§ 2255 Mem.* at 62. Counsel had objected only on relevance grounds and was overruled. *Trial*

*Tr.* at 522.  Evertson notes that his counsel in the Alaska case "succeeded in keeping out any mention or photos of Haz-Mat Suits, inflammatory videos, etc. as he told me it was unnecessary to introduce them and that they would be highly prejudicial."  *§ 2255 Mem.* at 62.

The Government responds that the video showed the cleanup and transportation to a sand pit to cut the top off a tank as well as the reactivity of the contents.  It further responds that it was required to prove that the material was reactive and did so by using the video to show the jury the extreme reactivity of the sodium.  Finally, the Government states that the video could have helped the defense because the rain in the video was "at odds" with one witness's statement regarding the weather.  *Response* at 28.

Even if counsel had offered to stipulate to the characteristics, they could not do so without the agreement of the Government.  The Government was entitled to present its evidence in the manner it perceived to be most effective.  Furthermore, the Court specifically recalls that it took great care at the time to ensure that the showing of the video was not prejudicial.  The evidence was relevant, and its probative value was not substantially outweighed by undue prejudice.  *See Fed. R. Evid. 401 (relevance),* and *Fed. R. Evid. 403 (undue prejudice).*

### J.    Failure to Renew Rule 29 Motion

Evertson contends that counsel was ineffective for not renewing the Rule 29 motion for acquittal post verdict even though the Court stated in denying the motion at the close of the Government's case that it would review the motion post-verdict if a

guilty verdict was reached.  *See § 2255 Mem.* at 63; *Trial Tr.* at 625.  The Government responds that whether or not to renew a Rule 29 motion is a tactical decision and that renewing a Rule 29 motion is asking the Court to conclude that the jury was not reasonable.  *Response* at 29. The Court did initially note that the evidence on Count One was "very, very thin" and that it would be "a little bit surprised if the jury would return a verdict on that count."  *Trial Tr.* at 624.

Despite the Court's statement, Evertson was not prejudiced by counsel's failure to renew the Rule 29 motion post-trial because the Ninth Circuit found that there was sufficient evidence to convict him.  *See United States v. Ortiz*, 281 Fed. Appx. 750, 752 (9th Cir. 2008); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1351 (9th Cir. 1995) (failure to renew Rule 29 motion does not rise to the level of *Strickland* ineffectiveness even though the failure "subjected any appellate challenge to the sufficiency of the evidence to a lower standard of review"); *United States v. Feldman*, 853 F.2d 648, 665-66 (9th Cir. 1988) (no ineffective assistance of counsel for failure to bring a Rule 29 motion because evidence supported the conviction).

### K.  Ineffectiveness of Appellate Counsel for Failure to Request a Rehearing Regarding Immediate or Beneficial Use Issues

Evertson claims that appellate counsel should have requested a rehearing on the immediate or beneficial use issues raised on appeal.  Neither the Government nor the Court is aware of any cases in any circuit holding that it is ineffective assistance of counsel to fail to request a rehearing on appeal.

The Ninth Circuit grants petitions for rehearing only infrequently.  To suggest that they would have done so here is purely speculative.  In any event, there would need to have been a likelihood that the Ninth Circuit would have reversed itself for Evertson to show prejudice.  This carries the speculative nature of the claim even further.  Counsel need not appeal every potential issue to be effective.  *See  Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980).  It follows that counsel need not move for rehearing following an adverse decision on appeal to be effective.  Accordingly, the claim of ineffective assistance of counsel against appointed appellate counsel Greg Silvey fails.

### L.     Failure to Object to the Lack of a Specific Intent Element in the Jury Instructions Based on 18 U.S.C. § 2, Aiding and Abetting

Evertson claims that counsel should have objected to the lack of a specific intent element in the jury instructions based on the inclusion of 18 U.S.C. § 2 in the Indictment in Counts Two and Three.  He claims that "[t]he difference between General Intent and Specific Intent in huge."  *§ 2255 Mem.* at 64.

The conduct set forth in Counts Two and Three of the Indictment was alleged to have been in violation of 42 U.S.C. § 6928(d)(2)(A), the substantive RCRA offense; 18 U.S.C. § 2, aiding and abetting the substantive offense; and Idaho Code § 39-4408, the State of Idaho's hazardous waste statute.  However, the only issue presented to the jury was whether Evertson had committed the substantive offenses alleged in Counts Two and Three.  *See Jury Instructions*, Dkt. 59, and *Jury Verdict*, Dkt. 60.

The conduct set forth in Counts Two and Three of the Indictment was alleged to have been in violation of 42 U.S.C. § 6928(d)(2)(A), the substantive RCRA offense; 18 U.S.C. § 2, aiding and abetting the substantive offense; and Idaho Code § 39-4408, the State of Idaho's hazardous waste statute.  However, the only issue presented to the jury was whether Evertson had committed the substantive offenses alleged in Counts Two and Three.  *See Jury Instructions*, Dkt. 59, and *Jury Verdict*, Dkt. 60.

Conviction of the charge of aiding and abetting the RCRA violations would

indeed have required a finding of specific intent but only as to helping the perpetrator of the RCRA offenses.  *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988)).  *See also United States v. Hernandez-Orellana*, 539 F.3d 994, 1006-07 (9th Cir. 2008); *United States v. Garcia*, 400 F.3d 816, 819 (9th Cir. 2005).  However, Evertson was charged alternatively with, and convicted of, the underlying substantive RCRA offenses which does not require specific intent.  Because the issue of aiding and abetting the RCRA offense was not presented to the jury, and because the substantive RCRA offense does not contain an element of specific intent, counsel was not ineffective for failing to object to lack of a specific intent instruction.

### M.    Failure to Object to Misleading and Half-Truth Testimony

Evertson contends that counsel should have objected to a portion of EPA responder Mark Callaghan's testimony that implied he contacted Evertson before the removal whereas he had not done so until June 17, 2004 – after the removal.  *§2255 Mem.* at 64. He claims he would have told Callaghan that he wanted the materials.  *Id.* The Government contends that the alleged "half-truth" should have been – and was – dealt with on a vigorous cross examination.  *Response* at 31.  However, that does not appear to be accurate with regard to this specific issue.  Nevertheless, Evertson cannot prevail on this claim.

Evertson's claim is based on comments made at sidebar during Callaghan's testimony.  He states that counsel for the Government said that, "In order to conduct a removal, one of the things he's supposed to do . . . he's supposed to contact the persons

who are potentially responsible for the substances," that Mr. Callaghan did that by calling
Evertson and asking what he wanted to do with the material, and that Evertson refused to
talk to him on the advice of counsel.  *§ 2255 Mem.* at 64.

A review of the transcript indicates that the government counsel called for a
sidebar because he was concerned that there might be a Fifth Amendment issue due to the
Alaska case.  *Trial Tr.* at 328.  During the ensuing discussion, Richert explained the
underlying circumstances.  He advised the Court that Callaghan had tried to reach
Evertson, but he was advised that Evertson was in custody on the Alaska charge and
could not be contacted.  *Id*.  Richert continued that ten days or two weeks later, the EPA
tried to set up a conversation with counsel.  *Id*.  After considering the circumstances, the
Court then concluded that the witness only needed to say "there was an effort made to
contact Mr. Evertson."  *Id*.

A review of the transcript also reveals that Evertson omitted a phrase when
quoting government counsel.  Counsel stated, ". . . one of the things he's supposed to do
– *he doesn't have to*, but he's supposed to contact the persons . . . ."  *Trial Tr.* at 327
(emphasis noting the omitted language).

When examination of Callaghan resumed, Callaghan responded "yes" to the
question, "before you do a removal, do you generally attempt to contact persons that may
own the material?"  *Trial Tr.* at 329.  He also responded "yes" to the question "and in this
case, you attempted to contact Mr. Evertson."  *Id*.

On cross examination, Richert asked Callaghan if he usually attempts to determine

ownership.  Callaghan said "CERCLA speaks to ownership, and we try to determine that, yes."  *Trial Tr.* 356.  He tries "early on" to determine a potential responsible party or owner of the materials and the owner of the property on which they were situated.  *Trial Tr.* at 357.  Callaghan was first contacted on May 28, 2004 and arrived in Salmon on May 29, 2004.  *Trial Tr*. at 362-64.  Chaffin as owner of the property was a potentially responsible party.  *Trial Tr.* at 377.  FBI Agent Kisabeth advised him that the materials were abandoned.  *Trial Tr.* at  395.  Callaghan conducted his own investigation to determine if the materials were abandoned.  *Trial Tr.* at 396.  He tried to contact Mr. Evertson.  *Id*.  He did make contact with him, but Evertson would not speak to him.  In keeping with the Court's admonition, when questioning him about his attempt to contact and his eventual contact with Evertson, Richert specifically advised Callaghan not to go too deeply into his contact with Evertson and not to discuss the conversation he may have had with him.  *Id*.

The Court finds that counsel was not ineffective for failing to object to Callaghan's testimony.  Callaghan could not answer the questions fully without opening the door to the existence of the prosecution in Alaska or violating the Court's directive at side bar.  It is obvious from a reading of the testimony that counsel and Callaghan were constrained by Fifth Amendment concerns as well as an oral directive of the Court not to refer to the Alaska prosecution.  *See Govt. Mot. in Limine* at 10-11, Dkt. 36; *Min. Entry* (granting Government's Motion in Limine (Dkt. 36) in part), Dkt. 48.

### N.        Failure to object to the Guideline Calculation on HTMUSA Count

Evertson contends that the 4-level enhancement for lack of a permit and the 4-level enhancement for monies spent for disposing of the materials were not proper because a permit was not required and the monies spent for disposing of the property was "not a direct result of the MHTA move." *§ 2255 Mem.* at 66-67.

A review of the Presentence Report indicates that the three counts of conviction were combined into a single group under USSG § 3D1.2(b) as they involved the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *PSR* ¶ 27. Referring to PSR ¶ 20, the Probation Officer applied a 4-level enhancement in accordance with § 2Q1.2(b)(4) "because the offense involved the transportation and storage of a hazardous material without a permit." *PSR* ¶ 31. That paragraph contained details not only about transportation of the material but also about storage. Although a permit may not have been necessary for transportation of the materials, a permit was required for storage. Evertson was convicted of two counts of storage without a permit. Just because transportation was mentioned in the same paragraph as storage does not mean that the 4-level enhancement was applied to the transportation count. Accordingly, there was no basis for objecting to the enhancement.

The Probation Officer also applied a 4-level enhancement in accordance with § 2Q1.2(b)(3) because the cleanup required a substantial expenditure. *PSR* ¶ 30. Evertson claims the expense incurred was not a direct result of the move. It was, however,

incurred as a direct result of the storage of the materials.  Defense counsel objected to the enhancement arguing that the cleanup was not necessary.  *Def's Obj. to PSR* at 12-14, Dkt. 69.  However, the Court overruled the objection.  *Sent. Tr.* at 115, Dkt. 93. Objecting to the enhancement as it pertained to the transportation count would have been pointless given that it was clearly applicable to the storage counts.

The Court notes that Vieth vigorously contested not only the 4-level enhancement for substantial cleanup but also the 9-level enhancement for substantial likelihood of death or serious bodily injury.  *PSR* ¶ 29 (applying § 2Q1.2(b)(2)); *Def's Obj. to PSR* at 10-12.  Vieth was successful in challenging the 9-level enhancement.  *Sent. Tr.* at 112-115.  This effectively reduced the guideline range from 57-71 months to 21-29 months. *PSR* ¶ 57;  *Sent. Tr.* at 121.  Counsel's performance at sentencing was in no way deficient.

The Court imposed a sentence of 21 months on each count to be served concurrently.  Even if the sentence on Count One taken alone should have been less, Evertson still would have had to serve 21 months of imprisonment on Counts Two and Three.  Accordingly, he cannot demonstrate prejudice.

### O.    Failure to Question Truck Driver About "Flippable" Placards

Evertson states that counsel should have questioned Mr. Dalrymple, the Salmon River Stages truck driver who delivered the sodium to the Tanner warehouse, if he could have had the EPA required placards on his truck turned off when he delivered the pure sodium metal.  *§ 2255 Mem.* at 67-68.  He feels it would explain why Chaffin "testified

MEMORANDUM DECISION AND ORDER - 48

to the EPA he saw none." *§ 2255 Mem.* at 68.  The Government responds that not asking a "minor witness" if he had "flippable" placards is "twenty-twenty hindsight at its most myopic." *Response* at 31.  It does not appear that Evertson addressed this issue in his Reply.

Dalrymple testified that the trailer carrying the sodium was placarded on all four sides, "Dangerous When Wet." *Trial Tr.* at 104-05; 109; 112.  Evertson believes the failure to ask him if the placards were flippable and turned off prejudiced him "in that 'willfully' is a very high bar for Count One, and if the placards were 'flipped off,' they would not have been visible to me or Mr. Clyde Chaffin when the sodium was delivered." *§ 2255 Mem*. at 68.  The Court fails to see the relevance or materiality of this issue.  Clyde Chaffin's statement to the EPA was not before the Court.

The Court can only assume that Evertson is attempting to show that he did not know that placards were needed for transporting sodium because he did not see them on the delivery truck.  However, Mr. Dalrymple could very well have testified that his placards were not flippable or that they were flippable and they were turned on.  That testimony would not have been helpful to his defense.  Evertson is speculating that Dalrymple would have testified that he had flippable placards, that they were turned off, and that the lack of this testimony prejudiced him.  Such speculation will not sustain a claim for relief in a § 2255 proceeding.

### O.   Failure to Object to Interchangeability of Terms "Hazardous Waste" and "Hazardous Materials"

Evertson alleges that counsel was ineffective for failing to object to the interchangeability of the terms "hazardous waste" and "hazardous materials" by Mr. Ross an EPA expert witness and Ms. Teri Gregory of the Idaho Department of Environmental Quality.  Ms. Gregory was a records clerk called solely for the issue of whether Evertson or Steel and Ranch had obtained a permit for storage or disposal of hazardous waste.

Evertson feels essentially that using the terms without precision confused the jury and was prejudicial.  This claim appears to be related to his claim that the jury instructions were improper.  The Ninth Circuit found that the jury instructions taken as a whole were not misleading and that "[t]he instruction requiring the jury to determine whether the 'hazardous waste' was identified as a hazardous waste by EPA did not mislead the jury or take the issue from them."  *Evertson*, 320 Fed. Appx. at 511. Accordingly, the Court finds that any prejudice from not objecting to the testimony was cured by the jury instructions.

### 3.   Grounds Not Previously Raised on Appeal

In Ground 4, Evertson claims that the RCRA is unconstitutionally vague as to the definitions of "solid waste" and "recycled," and the exemptions (exclusions).  *§ 2255 Mem*. at 53.  In Ground 7, he claims that he is entitled to relief based on cumulative errors.  *§ 2255 Mem.* at 72. The Government urges dismissal of these grounds and certain other subissues not previously raised on appeal as procedurally barred or lacking in

prejudice if not defaulted.  *Response* at 32.

Grounds not raised on appeal are procedurally defaulted absent a showing of cause

and prejudice or actual innocence.  *See Massaro v. United States*, 538 U.S. 500, 503

(2003).  *See also United States v. Jingles*,     F.3d   , 2012 WL 5834937 at *3 (9th Cir.

Nov. 19, 2012).  Evertson has shown neither.  Ineffective assistance of counsel can

constitute cause.  *See United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996).

However, Evertson has not alleged ineffective assistance of appellate  counsel with

regard to these grounds and has not alleged any other cause for not raising these issues on

appeal.  He has also not demonstrated actual innocence.

Actual innocence is evaluated under the standard enunciated in *Bousley*, which

held that to prevail on an actual innocence claim to excuse a procedural default, the

"petitioner must demonstrate that, in light of all the evidence, it is more likely than not

that no reasonable juror would have convicted him."  *Bousley v. United States*, 523 U.S.

614, 623 (1998) (internal quotations and citations omitted).  In other words, "'actual

innocence' means factual innocence, not mere legal insufficiency."  *Id*.

Evertson bases his claim of actual innocence on the testimony he would have

given had he been called to testify that he believes would have exonerated him.

However, as discussed above, it is unlikely that the jury would have acquitted him given

the overwhelming evidence and the impeachment material from the Alaska case.

Accordingly, any claims not raised on appeal are subject to dismissal.

The Court will briefly identify the issues and subissues Evertson raises for the first

time on appeal but will not analyze them in depth given its finding of procedural default.

### A.      Unconstitutional Vagueness

Evertson claims the definitions in RCRA for "solid waste," "recycled," and the related "exemptions" are vague because even after studying RCRA for over four years, he still "struggles" with what is an exemption from solid waste, what is notice of a crime under RCRA, and what constitutes a crime if the material is "abandoned."  *§ 2255 Mem.* at 53.  He cites comments by a former Assistant Director of the EPA Office of Solid Waste expressing the view that the "RCRA is a regulatory cuckoo land of definition" and "perhaps on five people at a time in the entire EPA fully understands what is a waste and what is not a waste."  *Id*. at 54-55.  However, he cites no case law on the issue, and the Government is aware of none.

There have been various unsuccessful challenges to portions of RCRA or its implementing regulations on vagueness grounds.  *See, e.g., United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001); *United States v. Protex Industries*, 874 F.2d 740 (10th Cir. 1989).  Most similar to this case is *United States v. Sims Brothers Construction, Inc.*, 277 F.3d 734 (5th Cir. 2001), finding that 42 U.S.C. § 6928(d)(2)(A), a statute of conviction under two counts here, was not unconstitutionally vague as applied to the defendants. The Fifth Circuit found that the defendants knew that the material in the containers at issue was at least potentially hazardous because the containers had "poison" and "fumigant" stamped on them yet the defendants left them in an open area for three weeks. The court reasoned that "What made their conduct criminal was the knowing storage of

hazardous waste without a permit." *Id*. at 740.

### B.      Cumulative Errors

In addition to seeking relief on the numerous grounds addressed above, Evertson urges the Court to "apply a cumulative error analysis and recognize the fundamental errors and due process violations in this case." *§ 2255 Motion* at 72.  The Government counters that because there were no errors, there were none to cumulatively violate due process. *Response* at 34 (citing *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004)).

The Ninth Circuit recognizes the concept of cumulative errors resulting in prejudice where no one error alone is prejudicial. *See Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992).  *See also Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).  However, it will not apply it where the alleged errors are not errors at all.  *See United States v. Lindsay*, 634 F.3d 541, 555 (9th Cir. 2011).  The Court has found no errors.

### C.      No Evidence of Aqueous Sludge

Evertson contends that there was no evidence presented that the "liquid" with a pH measured at 13.28 was "aqueous."  *§ 2255 Mem.* at 56.  Evertson admits that the issue was not raised or decided on appeal.  *Id*. at 57.  The Government contends that Evertson appears to confuse the sludge tank with the sodium hydroxide tank.  *Response* at 33.  In his *Reply*, Evertson offers no justification or cause and prejudice for the failure to raise the issue on appeal.  Nor does he respond to the Government's claim of confusion.

## CONCLUSION

Many of Evertson's claims are being dismissed because they had already been raised and rejected on appeal. Others are being dismissed because he failed to raise them on appeal and has not demonstrated cause or prejudice or actual innocence for failing to do so. However, the vast majority of claims and sub-claims alleged ineffective assistance of counsel. Dismissal of those claims requires further comment.

*Strickland* directs the Court to "eliminate the distorting effects of hindsight" to the extent possible and to evaluate the challenged conduct "from counsel's perspective at the time." *Strickland*, 466 U.S. at 690. Recognizing the difficulty of doing so, *Strickland* explained further:

> [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered *sound trial strategy*." There are countless ways to provide effective assistance in any given case. *Even the best criminal defense attorneys would not defend a particular client in the same way*.

*Id*. (citations omitted) (emphasis added).

As shown above, most of the acts and omissions of which Evertson complains are the result of strategic decisions generally left to counsel and not to the demands of a client. Furthermore, a difference of opinion regarding trial tactics is not proof of ineffective assistance of counsel. *See Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010) (citing *United States v. Mayo*, 646 F.3d 369, 375 (9th Cir. 1981) (per curiam)).

Evertson has had the opportunity over a period of years to spend what must have been hundreds of hours researching the statutes of conviction and the implementing regulations, reviewing trial testimony, combing the record for evidence of deficient performance on the part of Richert and Vieth, and preparing his written submissions. While the resulting proverbial 20-20 hindsight may raise the spectre of possible ineffective assistance of counsel, the Court must "eliminate the distorting effects of hindsight" as directed by *Strickland* and look to counsel's performance in the heat of the proceedings.

Just as it is likely that other counsel would possibly have defended Evertson differently, it is also likely that even Richert and Vieth would defend him differently if given the opportunity to retry the case.  However, in assessing their "overall performance throughout the case" as directed by *Kimmelman* in determining whether Evertson has met the "highly demanding" *Strickland* standard*,* the Court finds that Richert and Vieth's performance was reasonable.  *Kimmelman*, 477 U.S. at 381-82.

The Court notes that Evertson has repeatedly claimed throughout his filings essentially that he was prosecuted by overzealous prosecutors and defended by inept attorneys.  His family members argued the same with such intensity at sentencing that the Court felt compelled to comment. *Sent. Tr.* at 119.

RCRA "was enacted to protect the national health and environment."  *Wyckoff v. E. P.A.*, 796 F.2d 1197, 1198 (9th Cir. 1986).  Its "overriding concern . . . is the grave danger to people and the environment from hazardous wastes."  *United States v. Hoflin*,

880 F.2d 1033, 1038 (9th Cir. 1989).  As noted in *Hoflin*, the Supreme Court opined

when addressing an Interstate Commerce Commission regulation regarding shipment of

corrosive liquids, "Where . . . dangerous or deleterious devices or products or obnoxious

waste materials are involved, the probability of regulation is so great that anyone who is

aware that he is in possession of them or dealing with them must be presumed to be aware

of the regulation."  *United States v. International Minerals and Chemical Corp.*, 402 U.S.

558, 565 (1971).

The Court addressed the inherent difficulties of prosecuting individuals under

environmental statutes who have no intention of harming people or the environment.

*Sent. Tr.* at 117-18.  It noted that if no harm results from a prohibited activity people think

that the government is being harsh if it prosecutes, yet if people are injured and not

prosecuted, people blame the government for not doing enough.  *Sent. Tr.* at 118-119.

The Court also commented on Evertson's family members' statements which it

found to "demean" all those involved in the process including "demean[ing] the public

defender's office which provided first class representation in every case [it has] appeared

before me . . . ."  *Sent. Tr.* at 119.  Indeed, Evertson will likely always feel that he was

wrongfully prosecuted given his testimony before a Congressional subcommittee on July

22, 2009 entitled "The Overcriminalization of Conduct: Consequences for an American

Inventor."  *See 2255 Mem.*, Exhibit G, Dkt. 9 (in expandable file in Clerk's Office).

However, both the record and the Court's own recollection demonstrates that counsel

performed quite well given a demanding client, difficult facts, and difficult legal issues.

## MOTION FOR NEW TRIAL

Three months after filing his § 2255 Motion, Evertson filed a Motion for New Trial on the grounds of newly discovered evidence that "proves" his "lack of knowledge of abandonment." The verdict was entered June 18, 2007, and the motion was filed June 16, 2010. Therefore, the Motion is timely. *See* Fed. R. Crim. P. 33(b)(1).

The new evidence presented by Evertson is a "newly discovered Christmas Card on December 5, 2003" from his sister Diana Sundles which "shows conclusively that she knew my mailing address as of that date" and "clearly shows without possible dispute that if Robert Chaffin had been actively asking her how to reach me during the crucial 4 month time period from August of 2003 to December of 2003, she would have mentioned that fact in the Christmas Card she sent to me on December 5, 2003." *Mot.* at 2-3. The card was addressed to him in care of his mother who lived in Alaska.

A new trial may be granted by the district court when the "interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant seeking a new trial on the basis of newly discovered evidence must prove:

> (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; *and* (5) the evidence indicates that the defendant would probably be acquitted in a new trial.

*United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir.) (2009) (en banc) (emphasis added).

Even if the evidence met the first two factors, the card does not meet the

remaining factors of the conjunctive standard.  It was Evertson's failure to contact Chaffin that was material to his intent to abandon the materials.  It was not Chaffin's responsibility to contact him.

That the card was addressed to Evertson in care of his mother does not show that his sister actually knew where he was.  At best, the card could have been used to impeach his sister's and Chaffin's testimony that they did not know how to reach him.  Evidence that is merely impeaching cannot form the basis for granting a new trial.

Finally, Evertson cannot show that he probably would have been acquitted with this evidence.  It would show perhaps that he could have been contacted, but the Sundles' or Chaffin's failure to contact him was not the issue.  To warrant a new trial, the evidence must address testimony that represents the only evidence of an essential element of the government's case.  *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992).  The Christmas card does not rise to that level.  Accordingly, the Motion for New Trial is denied.

## CERTIFICATE OF APPEALABILITY

A § 2255 movant cannot appeal from the denial or dismissal of his § 2255 motion unless he has first obtained a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A certificate of appealability will issue only when a movant has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To satisfy this standard when the court has dismissed a § 2255 motion (or claims within a

§ 2255 motion) on procedural grounds, the movant must show that reasonable jurists would find debatable (1) whether the court was correct in its procedural ruling, and (2) whether the motion states a valid claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).[2]   When the court has denied a § 2255 motion or claims within the motion on the merits, the movant must show that reasonable jurists would find the court's decision on the merits to be debatable or wrong. *Slack,* 529 U.S. at 484; *Allen v. Ornoski*, 435 F.3d 946, 951 (9th Cir. 2006).

After carefully considering the record and the relevant case law, the Court finds that reasonable jurists would not find the Court's determination that counsel's performance was not constitutionally deficient to be debatable or wrong.  Further, it finds that reasonable jurists would not find the Court's decision barring the remaining issues for having been raised and decided on appeal or for being procedurally barred for not having been raised on appeal to be debatable or wrong.  Accordingly, a certificate of appealability will not issue.

## ORDER

**IT IS ORDERED:**

1.   Krister Sven Evertson's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Dkt. 1) is **DISMISSED**.

---

[2]   The requirements for a certificate of appealability for a § 2255 appeal do not appear to differ from the requirements for a certificate of appealability for a § 2254 habeas petition related to a state conviction.  *See United States v. Asrar*, 116 F.3d 1268 (9th Cir. 1997).  Therefore, cases addressing the requirements in the context of a § 2254 proceeding are pertinent to a § 2255 proceeding as well.

2.      Krister Sven Evertson's Motion for New Trial (Dkt. 125) in Criminal Case

No. 4:06-cv-206-BLW is **DENIED**.

3.      A certificate of appealability shall be denied as to all issues.  Evertson is

advised that he may still request a certificate of appealability from the Ninth

Circuit Court of Appeal pursuant to Federal Rule of Appellate Procedure

22(b) and Local Ninth Circuit Rule 22-1.  To do so, he must file a timely

notice of appeal.

3.      If Evertson files a timely notice of appeal, and not until such time, the Clerk

of Court shall forward a copy of the notice of appeal, together with this

Order, to the Ninth Circuit Court of Appeals.  The district court's file in this

case is available for review online at www.id.uscourts.gov.

DATED:  **March 6, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 60**